ABRAHAM STERN, On Behalf of Himself and All Other Parties Similarly Situated, Appellant, v ARTHUR L. CARTER et al., Respondents, et al., Defendants.

Second Department, August 10, 1981

APPEARANCES OF COUNSEL

*Bader & Bader (I. Walton Bader* of counsel), for appellant.

*Paul, Weiss, Rifkind, Wharton & Garrison, (Robert L. Laufer* of counsel; *Richard Wasserman* on the brief), for respondents.

TITONE, J. P.

Plaintiff, a former shareholder of common stock of defendant Elgin National Industries, Inc., instituted this class action suit against defendants for violations of the Securities Act of the State of New York (General Business Law, §§ 339-a, 352-c), common-law fraud and breach of fiduciary duties. The issues presented on appeal are whether, under the circumstances, defendants may, in a pretrial discovery proceeding, elicit answers from plaintiff to certain questions pertaining to (a) plaintiff's willingness and ability to finance the class action, (b) what financial arrangements he made with counsel regarding fees and expenses of the litigation, (c) how he decided to bring the lawsuit and whether anyone solicited him to do so, and (d) what personal knowledge he had regarding the allegations contained in the complaint.

In his complaint plaintiff Abraham Stern alleged that two publicly owned corporations, defendants Elgin National Industries, Inc. (Elgin) and Utilities & Industries Corp. (Utilities), and the individual defendants, with intent to defraud plaintiff and a class of about 3,000 other shareholders of approximately 300,000 shares of Elgin common stock, falsely and fraudulently advertised as to the value or facts affecting the value of such stock. As a result, plaintiff claimed that he and the stockholders were induced to sell their shares to Elgin at a loss to the class in the sum of $13,000,000. According to plaintiff, Elgin's board of directors initially made a tender offer on March 8, 1976, which was amended and extended on March 26, 1977, in which it was falsely recited that the offer was made so that Elgin could continue paying dividends on a quarterly basis of 10¢ a share, whereas the board had determined to, and thereafter did in fact, increase the dividends substantially and also split the stock at a ratio of three for one.

While he admitted not knowing with particularity the number of shareholders who sold shares to Elgin under the tender offer, plaintiff stated in the complaint that if 300,000 shares were so tendered, the number in the class would probably be about 3,000.

Plaintiff also alleged that the original tender offer contained a statement that the number of the shares of Elgin publicly held on February 28, 1976 was approximately 823,000 shares, and that if more than 223,000 shares were purchased by Elgin pursuant to its tender offer, the number of publicly owned shares would fall below 600,000 shares and the New York Stock Exchange might discontinue listing the sales of Elgin stock.

Furthermore, according to the complaint, a statement was also included in the original tender offer that unless the purchase of shares thereunder exceeded 424,000 shares, Elgin, after the purchase, would meet the requirements of the American Stock Exchange (Amex) for listing its shares on that market. Plaintiff contended that such statements were false and known to be false by defendants because (a) the true intention of defendants, as subsequently carried out by them, was to split the Elgin shares to prevent "delisting" by the New York Stock Exchange, and (b) rather than defendants' intending to list the stock on the Amex, actually the import of defendants' statements with respect thereto, was to "frighten" shareholders into believing that even a listing on the Amex for Elgin shares might not be possible.

In addition to claiming in his complaint that defendants, *inter alia*, fraudulently withheld information about the contemplated stock split, plaintiff also asserted that defendants failed to inform the tendering stockholders of a contemplated substantial dividend increase, were aware of being entitled to a "tax loss carry forward," but expressed doubt in their report that it would be obtained, and recognized no income from the sale of the Elgin Watch Division in 1973, although such division was sold for $8,915,000 "over unrecovered costs."

At his examination before trial, plaintiff refused to answer some 36 questions relating to (1) his ability and willingness to furnish expenses of the class action, (2) the circumstances under which he initiated the litigation, (3) the financial and fee arrangements he had with his attorney of record (Bader and Bader), and (4) his personal knowledge concerning the allegations contained in the complaint.

Plaintiff sought a protective order with respect to these questions and defendants Carter, Graham and Utilities (hereafter the moving defendants, or respondents) cross-moved to compel plaintiff to answer. (The 36 disputed questions, annexed hereto as an appendix, were not answered by plaintiff on advice of counsel. They are set forth in plaintiff's appendix on appeal and are broken down into the four categories in respondents' brief on appeal.) In support of his refusal, plaintiff argued at Special Term that questions as to such matters were irrelevant to establish the five prerequisites for a class action set forth under subdivision a of CPLR 901.[1]

In granting the cross motion and denying plaintiff's motion, Special Term held (97 Misc 2d 775) that since the plaintiff was required to demonstrate clearly that he had and would use sufficient financial resources in order to represent the class fairly and adequately, the moving defendants were entitled to depose him in order to ascertain whether he was willing and able to bear the financial expenses necessary to prosecute the action. The court noted that a plaintiff's lack of sufficient assets to prosecute such an action may inhibit the proper litigation of the substantial property interests of the whole class.

Special Term also opined that since the intrinsic nature of class actions ineluctably creates circumstances which engender solicitation of potential parties plaintiff, and class action status will be denied or the class will be decertified when counsel's conduct is found to be champertous, the moving defendants could also depose plaintiff concerning

---

1. CPLR 901 (subd a) provides as follows:

"§ 901. Prerequisites to a class action

"a. One or more members of a class may sue or be sued as representative parties on behalf of all if:

"1. the class is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

"2. there are questions of law or fact common to the class which predominate over any questions affecting only individual members;

"3. the claims or defenses of the representative parties are typical of the claims or defenses of the class;

"4. the representative parties will fairly and adequately protect the interests of the class; and

"5. a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

the circumstances under which he and his attorney concluded the agreement to prosecute the action, including reference to communication with and assembly of the class which the plaintiff proposed to represent.

Finally, Special Term concluded that since a named plaintiff may not be authorized to represent the class unless he plays an integral rather than a superfluous role in the litigation, the moving defendants could depose plaintiff concerning his knowledge of the details of the complaint to the limited extent required to explore whether he is a proper representative of the class or one who merely offered himself *pro forma*, and that questioning in that regard would be limited to issues of fact rather than matters of law. Plaintiff has appealed. Although an appeal does not lie of right (see *Siegal v Arnao*, 61 AD2d 812), in view of the nature of the issues raised, leave to appeal is granted (see *Carvalho v New Rochelle Hosp.*, 53 AD2d 635).

## HISTORY

Before addressing directly the issues involving pretrial disclosure of information sought by a defendant concerning the financial resources of a plaintiff, his financial arrangement with counsel, his solicitation of class members, and his personal knowledge of the allegations contained in the complaint, we believe it advisable to discuss briefly some historical aspects of class actions, and the evolving of demands for such pretrial disclosure in this area of the law. Although the information sought by respondents herein is separated into the four categories enumerated above, the theme underlying each category is the alleged need for an inquiry into financial and related matters of plaintiff in order to aid the court in deciding whether the representative party or parties will fairly and adequately protect the interest of the class (see CPLR 901, subd a, par 4). In turn such decision has an important bearing on whether the court should grant or deny class certification (see CPLR 902). It should also be observed at the outset that much if not most class action litigation has been and still is conducted in the Federal courts. Thus, the ensuing discussion will delve extensively into Federal case law on the subject and also Rule 23 of the Federal Rules of Civil Procedure

(hereinafter referred to as Rule 23), entitled "Class Actions".

Historically, a class action was an equitable concept promulgated as an exception to the general equity rule that persons, however numerous, materially interested in the subject matter of a suit were to be made parties to it (Homburger, State Class Actions and the Federal Rule, 71 Col L Rev 609, 611). They were known to English chancery practice since the 17th century[2]. Notwithstanding its departure from the more traditional notions of procedural due process, the class action device found ready acceptance in the United States. More than 100 years ago the United States Supreme Court said in dictum that "the decree [in a class suit] binds all of them the same as if all were before the court" (Smith v Swormstedt, 16 How [57 US] 288, 302 [1853]).

The first State statute on class suits was enacted in New York in 1849 (L 1849, ch 438), as an amendment to the Field Code (of Civil Procedure) of 1848 (L 1848, ch 379). It spread, along with the Field Code, to most States of the Union and became the American standard provision for class actions. The 1849 amendment, added to the provision in the Field Code (§ 119) requiring joinder of parties "united in interest", provided as follows: "and when the question is one of common or general interest of many persons, or when the parties are very numerous and it may be impracticable to bring them all before the court, one or more may sue or defend for the benefit of the whole."

With respect to the history of class actions in Federal courts, further research reveals that from 1913 to 1938 they were conducted under Federal Equity Rule 38. Such rule was modeled on the 1849 amendment to the Field Code and contained very similar language.[3] Absent from both

2. How v Tenants of Bromsgrove (1 Vern 22 [1681]). In How a bill of peace was filed by the lord of manor to ascertain whether he had a grant of free warren, and if so, whether sufficient common was left for the tenants.

3. "38

"REPRESENTATIVES OF CLASS.

"When the question is one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court, one or more may sue or defend for the whole" (Rules of Practice for the Courts of Equity of the United States, 226 US 629, 659).

the 1849 State legislation and Equity Rule 38 was any statement to the effect that the person or persons seeking to represent the class would do so effectively and/or adequately.

However, Rule 23 as originally adopted in 1938, besides being a codification of prevailing practice under Equity Rule 38, and containing three separate categories of class actions, also provided, *inter alia*, that the person or persons bringing the action on behalf of the purported class should "fairly insure the adequate representation of all."[4]

Similarly, the present Rule 23, as amended in 1966, although opening for class action treatment a new area where common questions of law or fact form the only bond of union among members of a class, also carried over a requirement that the representative parties furnish, *inter alia*, adequate representation of the members comprising the class.[5]

### EVOLUTION OF FINANCIAL INQUIRY

The landmark decision first establishing guidelines as to financial responsibilities required of a class plaintiff is *Eisen v Carlisle & Jacquelin* (417 US 156), referred to by legal authorities as *"Eisen IV"*. This case did not involve

---

4. Rule 23 (as adopted in 1938) provided, *inter alia:* "(a) Representation. If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as *will fairly insure the adequate representation of all* may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is (1) joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it; (2) several, and the object of the action is the adjudication of claims which do or may affect specific property involved in the action; or (3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought." (Emphasis supplied.)

5. Rule 23 as amended in 1966 provides, *inter alia:*
"RULE 23. CLASS ACTIONS
"(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) *the representative parties will fairly and adequately protect the interests of the class.*" (Emphasis supplied.)

construction of the fair and adequate representation requirement set forth in Rule 23 (subd [a], par [4]), but, rather, a construction of the notice requirement set forth in paragraph (2) of subdivision (c) of such rule.[6] The Supreme Court in *Eisen IV* held that under paragraph (2) of subdivision (c) a class representative is required to bear the cost of notice to absent members of the class, and that cost could not be shifted to the defendant. By requiring the class representative to pay notice costs, the Supreme Court simultaneously underscored the protective role of a class representative and annexed financial responsibilities to that role (Kaye & Sinex, The Financial Aspect of Adequate Representation Under Rule 23 [a][4]: A Prerequisite to Class Certification?, 31 U of Miami L Rev 651, 653-654). It should be noted that while the plaintiff's damages in *Eisen* amounted to $70, the class damages sought totaled in the millions of dollars. However, the plaintiff was less than willing to pay a $315,000 notice cost to adjudicate his small claim as required by the decision, and as a result the action was not continued. Thus, defendant in *Eisen IV* was safeguarded from attacks on its alleged illegality since no single plaintiff had sustained sufficient damages to warrant payment of the notice costs.

The conception of the role of a class representative enunciated by the Supreme Court in *Eisen IV (supra)*, although developed under a construction of Rule 23 (subd [c], par [2]) dealing with notice to members of the class, was extended by lower Federal courts to support the argument that Rule 23 (subd [a], par [4]), through its fair and adequate representative requirement, imposes financial responsibilities on the class representative, and places upon him the burden of demonstrating that he is able to pay the costs of the entire suit.

The theory presented in such Federal cases relying on *Eisen IV (supra)* was that a representative who is not willing or able to pay the costs of a class suit, jeopardizes the

---

6. Rule 23 (subd [c], par [2]) provides, in part: "In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."

interests of the absent class members. Ironically this theory, designed to protect absent class members, has been invariably employed by affluent defendants in order to prevent class certification of the person or persons instituting the suit.

The thrust of defendants' arguments in favor of disclosure of a plaintiff's financial ability to prosecute a class action in Federal court has been that class actions are expensive, *in terrorem* devices to which they should not be subjected without reasonable assurance that the result of the case will be *res judicata* for the absent class members. Because adequate representation is the primary criterion for the *res judicata* effect, plaintiff should be obligated to demonstrate financial resources to prosecute the case rigorously. Defendants have also raised the argument that if a plaintiff lacks such resources and counsel is in fact advancing costs without reasonable expectation of reimbursement, then counsel for the class is engaging in unethical maintenance of the suit. Without adequate resources, the argument continues, a plaintiff could harass a defendant with a frivolous suit, hoping for a large recovery but being immune from financial recriminations if the suit fails (Maute, Class Certification: Relevance of Plaintiff's Finances and Fee Arrangements with Counsel, 40 U of Pitt L Rev 70, 75-76).

On the other hand plaintiffs have contended that their financial resources are irrelevant to adequacy of representation and thus are outside the permissible scope of discovery. They have labeled such discovery motions as strategies and dilatory efforts to chill prosecution of class claims. In addition, plaintiffs have claimed that when courts sanction such tactics, they then are effectively subverting a primary purpose of Rule 23, namely, providing access to courts for plaintiffs of modest means who have collectively suffered a large-scale harm though their individual damages may be small. Consistent with such premise, plaintiffs have also asserted that when their financial resources are considered relevant to whether the class should be certified, defendants' large-scale wrongs are unassailable because of the cost of litigation (40 U of Pitt L Rev 70, 73).

Since approximately 1973, a body of case law has evolved, primarily in the Federal courts, in which inquiries as to the ability of a plaintiff to finance a class action has been held relevant. For example, in *Ralston v Volkswagenwerk, A.G.* (61 FRD 427), an action was brought by individual automobile buyers in which it was alleged that a manufacturer, an importer, a regional distributor and dealers of a foreign automobile entered into a conspiracy to maintain the price of the vehicle at an artificially inflated price by agreements to eliminate price competition. Under the alleged agreements the dealers were forbidden from deviating from the manufacturer's suggested retail price in the sale of new vehicles.

During the course of a hearing evidence was adduced that plaintiff Ralston, a law professor, had approximately $9,500 which he was willing to commit to the lawsuit. His coplaintiff had arranged a line of credit in the amount of $5,000. The potential class, as alleged by plaintiffs, would consist of every new Volkswagen purchaser in the United States, which, according to plaintiffs' amended complaint, could include as many as 4.5 million persons. In denying class action status to the litigation on the ground, *inter alia*, that plaintiffs had not sustained their burden of showing that they would adequately protect the interests of the class, Judge URBOM of the United States District Court, Western District, Missouri, stated that developing evidence on the merits would entail the examining of massive amounts of automobile sales records, the expense of which would substantially exceed the amount of money the plaintiffs had at their disposal. Judge URBOM also made the following observations (61 FRD, at p 434):

"Seeking to represent a large group of people as a class representative in a lawsuit is a very heavy responsibility. It should never be undertaken lightly, and the court should allow such representation only upon a firm foundation that the named plaintiffs are willing and financially able to shoulder that burden. Such a lawsuit should never be undertaken in the hope that at some future date the existence of a class will aid the plaintiffs in carrying the case to completion, because nobody knows whether other unidentified members of the class are able or willing to finance the

action. Inadequate financing threatens the procedural and substantive interests of all members of the class.

"All of this is not to say that large numbers of persons should not coalesce their finances in supporting a class action. But the pooling should be made before the suit is filed, thereby assuring sufficient resources, rather than relying upon court processes to coagulate a class who may be willing and able to underwrite the action.

"It is my conclusion that the named plaintiffs have not shown their ability to protect adequately the interests of the class."

Although not denying class action status *in toto*, in *P.D.Q. Inc. of Miami v Nissan Motor Corp.* (61 FRD 372), Judge ATKINS of the United States District Court, Southern District, Florida, did limit the class size in accordance with the plaintiffs' available resources. In *P.D.Q.*, two cases consolidated for the purpose of conducting pretrial proceedings, the complaints in both actions alleged Sherman and Clayton Act antitrust violations by the defendant automobile manufacturer and by its various franchise dealers. Both plaintiffs sought to represent a nationwide class of Datsun purchasers. The individual plaintiff stated he was unwilling to spend more than $1,000 to litigate the action, while the corporate plaintiff stated it was unwilling to borrow up to $100,000 to reimburse his counsel for advanced costs should the action fail. Based on such facts Judge ATKINS held, *inter alia*, that a nationwide class of all purchasers of Datsun automobiles from 1968 to 1972 was not feasible because of plaintiffs' inability to perfect the notice required under Rule 23. He then limited the class to those who purchased Datsuns either in New York County, New York, or Dade County, Florida, during the afore-mentioned years.

Of equal significance in the *P.D.Q.* case, was the attitude of Judge ATKINS with respect to the announced willingness of the attorneys for the plaintiffs to advance some of the necessary costs of notice and litigation expenses. After quoting excerpts from canon 5, DR 5-103(B) of the Code of Professional Responsibility, in which it is stated that in certain instances it is not improper for an attorney to

guarantee or advance expenses of litigation, etc., Judge ATKINS stated (61 FRD, at pp 379-380):

"The tenor of both these provisions indicates the approval of these type of financial arrangements between lawyer and client, especially as to the advancements, as *a necessary evil*, but only in certain narrowly confined circumstances; to wit, when without such advancements the client would be precluded from exercising his right to a remedy provided by law * * * When the considerations of Disciplinary Rule 5-103(b) are coupled with the acknowledged desirability of private antitrust enforcement, it seems clear that the attorney representing a potential plaintiff *may ethically advance the costs of litigation, subject of course to the requirement that the plaintiff remain ultimately liable* * * *

"Much has been written about the ethical problems inherent in the day-to-day functioning of Rule 23. The evils of client solicitation, stirring up litigation and advertising confront every Court when class action treatment has been requested." (Emphasis supplied.)

Other Federal courts have also demonstrated a willingness to police the ethics of class counsel rigorously. In *Stavrides v Mellon Nat. Bank & Trust Co.* (60 FRD 634, 636-637 [WD, Pa]), Judge McCUNE held that defense counsel in a class action could inquire by deposition whether solicitation and maintenance had occurred and also into professional conduct of counsel for plaintiffs, in order to attempt to discover disabling breaches of professional responsibility which would prevent plaintiffs' counsel from vigorously and forthrightly taking up the cause of the class they sought to represent. In a footnote (p 637, n 6), Judge McCUNE perceived that class actions are subject to abuse through unethical solicitation of clients and maintenance of the case. Consequently, he promised to assert vigorously the court's " 'broad * * * power' to assure ourselves that there is no ethical misconduct involved * * * before granting class status." Consistent with the thrust of his opinion, Judge McCUNE in *Stavrides* compelled plaintiffs to answer several of defense counsel's questions regarding the financial arrangements between plaintiff and

counsel that plaintiff had refused to answer (60 FRD, at p 638).

In *Rode v Emery Air Frgt. Corp.* (76 FRD 229 [WD, Pa]), defendant was allowed discovery of plaintiffs' net worth to determine whether plaintiffs' obligation to reimburse advanced costs was illusory. Such judicial action was taken despite the fact that the attorney for the class had agreed to advance litigation expenses subject to plaintiffs' reimbursement obligations. Judge TEITELBAUM, in *Rode* (pp 231-232), expressed concern that "[i]ndigent nominal plaintiffs could bring frivolous class suits without fear of reprisal in the hope of *'blackmailing'* the defendant into a settlement".

The court in *Rode (supra)* also asserted that defendants should not be subjected to class action litigation expenses without some assurance of recovering their costs if the action were frivolous. According to Judge TEITELBAUM (p 231), the purpose of statutory attorneys' fees to penalize frivolous suits "would be completely abrogated if financial data of the representative plaintiffs were deemed irrelevant." In addition, he believed that counsel's advancement of litigation expenses presented a potential danger to adequate representation because (pp 232-233): "[T]he attorney is able to assume primary control over the lawsuit. At any point in time where the desires of the representative plaintiff differ from those of his counsel, the threat of fund revocation, whether express or implied, could serve to coerce the representative plaintiff into complying with his attorney's position. The result of advancing litigation costs is that the Rule 23 responsibility of adequately representing the class becomes entrusted to the attorney rather than the litigant."

However, not every Federal court looks with favor upon a request by a defendant for a pretrial inquiry into, *inter alia*, the financial capacity of a plaintiff in a class action and his arrangements with counsel. In *Sanderson v Winner* (507 F2d 477, 479, cert den *sub nom. Nissan Motor Corp. v Sanderson,* 421 US 914), the Tenth Circuit Court of Appeals described an order of the District Court granting such disclosure as an "unwarranted extension of the Su-

preme Court's decision in *Eisen* v. *Carlisle & Jacquelin* * * * which extension would limit and curtail Rule 23 in a manner never contemplated."

In *Sanderson (supra,* p 478) plaintiffs sought a writ of mandamus and prohibition from the Tenth Circuit directing the District Court to vacate certain discovery orders and prohibit it from issuing future discovery orders "which would invade the attorney-client privilege relating to financial arrangements with attorneys." In the complaint, pursuant to Rule 23 (subd [b], par [3]), it was alleged that the various Nissan corporations had engaged in an unlawful conspiracy with automobile dealerships in violation of the Sherman Antitrust Act. During the pendency of the case plaintiffs were served with a demand for (1) current financial statements, income tax returns for the years 1972 and 1973, and any other writings or documents reflecting on plaintiffs' ability to finance the expenses of the class action, and (2) any agreements plaintiffs had made, either among themselves or with, *inter alia,* their attorneys of record pertaining to the financing of the costs of the litigation, and payments of attorneys' fees that may be incurred. After opining that there was nothing in the opinion of Supreme Court Justice POWELL in *Eisen IV* (417 US 156, *supra)* calling, *inter alia,* for unlimited inquiry into the financial capacity of a class plaintiff or fee arrangements with lawyers, the Tenth Circuit made the following observations *(supra,* pp 479-480):

·"Defendants considered it important to ascertain whether plaintiffs were able to pay *all* of the costs in the litigation including extensive depositions. We fail to see relevancy in these inquiries particularly with respect to *in limine* inquiry as to whether a class action is to be allowed. Ordinarily courts do not inquire into the financial responsibility of litigants. We generally eschew the question whether litigants are rich or poor. Instead, we address ourselves to the merits of the litigation. We recognize that the class action is unique and we see the necessity for the court to be satisfied that the plaintiff or plaintiffs can pay the notice costs, and we also agree fully with the Court's ruling in *Eisen* that due process requires decent notice. *But we do not read Eisen as creating a presumption against finding*

*a class action. Nor does it approve oppressive discovery as a means of discouraging a private antitrust action which, if meritorious, advances an important interest of the government * * ** 

"Nor do we see that the defendants have any legitimate concern as to whether plaintiffs will be able to pay their lawyers and will be able to pay a judgment for costs in the event that such a judgment is entered. In this respect we see no difference between the case at bar and any other lawsuit * * *

"The fee arrangement between plaintiffs and attorney may not be privileged. We have found cases which rule that such information is privileged and there are other cases to the contrary. It depends on the circumstances. We need not pursue this in view of our conclusion that it is irrelevant. Neither the court nor the defendant has legitimate concern as to the propriety of the arrangement under the code of responsibility. As indicated, whether the plaintiff will be able to pay costs is not now relevant. Tax returns are not generally discoverable. It is only when the plaintiff's income is directly in issue. Otherwise there is a public policy against an exposure." (Emphasis supplied.)

Also, in *Sayre v Abraham Lincoln Fed. Sav. & Loan Assn.* (65 FRD 379 [ED, Pa], mod 69 FRD 117), plaintiffs' counsel agreed to advance all litigation costs, subject to plaintiffs' responsibility to reimburse counsel if the case was lost. Defendants then sought discovery of the plaintiffs' financial ability and willingness to reimburse these costs, asserting that if there was not a reasonable expectation of repayment, counsel was unethically maintaining the suit, thus rendering plaintiffs inadequate representatives. Judge NEWCOMER rejected such arguments on the ground that advancements were a predictable element of class actions. While conceding that plaintiffs' ability to advance costs was relevant, Judge NEWCOMER nevertheless was of the opinion that the mere fact that advancements exceeded plaintiffs' resources was not cause for class denial. He also stated (65 FRD, at p 385): "It is this Court's judgment—admittedly based on experience and hunch rather than any collected empirical data—that to deny a class whenever

plaintiffs' counsel advances significant funds to plaintiffs of little or modest means would be to defeat the very purposes which class actions were designed to achieve. This is particularly true where, as here, the costs of litigating the suit would exceed the damages allegedly sustained by an individual plaintiff. In other words, in precisely those cases where the class action device is most appropriate the disparity between the costs of litigation and the resources of the individual plaintiffs will be most pronounced. As much as we are concerned with possible unethical conduct by counsel, we cannot condone a policy which would effectively limit class action plaintiffs to corporations, municipalities, or the rich."

Of some significance is the fact that the Tenth Circuit in *Sanderson (supra)*, although seemingly taking the position that a class plaintiff's finances and fee arrangements are irrelevant with respect to the issue of adequate representation, and thus not subject to pretrial discovery, took pains to distinguish *Sanderson* from the earlier District Court cases *(P.D.Q. Inc. of Miami v Nissan Motor Corp., supra; Ralston v Volkswagenwerk, A.G., supra)*, in which such inquiries were strongly favored. The latter cases were distinguished in *Sanderson* as potential nationwide classes with problems involving size and manageability, two concerns the Tenth Circuit did not believe were present in *Sanderson.*

Similarly, with respect to the issue of whether the ethics of class counsel should be rigorously policed (and the underlying question of the efficacy of plaintiff's counsel advancing litigation costs), the court in *Sayre v Abraham Lincoln Fed. Sav. & Loan Assn. (supra)*, which expressed strong disfavor to such monitoring, saw fit to state that its decision in *Sayre* was not in opposition to the one in *Stavrides v Mellon Nat. Bank & Trust Co.* (60 FRD 634, *supra)*, in which close monitoring was encouraged. According to the court in *Sayre, Stavrides* did not hold for the proposition that defendants are entitled to discover plaintiff's financial assets in order to support an inference that the suit is being maintained by counsel. Rather, *Stavrides* merely stated that defendants may discover what plaintiffs had been told concerning their liability for expenses and the nature of their

agreement with counsel concerning the payment of litigation expenses.

Despite such strong efforts toward reconciling seemingly contrary points of view, we share the opinion of legal writers in this area that the Federal courts are seriously split on the relevance, importance and scope of precertification financial discovery with respect to a plaintiff's finances and his arrangements with counsel.

One writer notes that given the ambiguity in *Sanderson* (507 F2d 477, *supra*), it is not surprising that District Courts have split on the question of the relevance of a class plaintiff's finances. Although some courts have declared plaintiff's ability to finance the entire cost of the suit relevant, others have reached the opposite conclusion. Moreover, the writer states, there is no pattern suggesting that size or manageability problems are the sole factors used in making the determination of relevance. However, of those courts that have found the information relevant, discovery has been allowed in differing degrees and in different manners. Such cases fall into the following four categories: (1) plaintiffs must divulge the full financial data being sought; (2) plaintiffs must answer questions that show their awareness of the extent of the costs and their willingness to assume full responsibility for those costs; (3) plaintiffs must submit *in camera* affidavits showing their willingness, as well as ability, to pay the costs; and (4) plaintiffs must merely state unequivocally that they will be ultimately responsible for all expenses (Bullock, Discovery of Plaintiffs' Financial Situation in Federal Class Actions: Heading 'em Off at the Passbook, 30 Hastings L J 449, 464-465).

With respect to judicial monitoring of class counsel and inquiry into the ability of plaintiff to reimburse funds advanced by such counsel, the same legal writer, after summarizing and discussing a number of cases on the question, comes to the conclusion that, predominently, the Federal courts seem either to find the plaintiff's finances irrelevant, or, if relevance is found, to use controls to protect the plaintiff from unnecessary disclosure. She takes the position that it is more equitable and less harassing for the court to examine data submitted by plaintiff *in camera*, rather than

allowing the defendant full discovery of information that might be strategically vital to the plaintiff (Bullock, *op. cit.* pp 466-470). In concluding her treatise on this complex problem, Ms. Bullock expressed strong reservations against allowing defendant broad discovery rights in this area when she stated (pp 473-474) :

"It is not as critical to prejudge whether the plaintiffs will be able to afford to prosecute the suit vigorously to its conclusion as it is to determine whether the named plaintiffs are able to give notice to the class. The litigation should not be 'sidetracked by a mini-trial in which defendants attempt to prove that plaintiffs are financially incapable of meeting the costs of [the] litigation.'

"Once the funds for the suit are advanced by the plaintiffs' attorneys, the plaintiffs' proper financial resources should no longer be relevant since proper notice to class members is assured. The ethics of 'maintenance' in the context of class actions should be reexamined by the legal profession. In large class actions it is unrealistic to assume that a few individuals will be able to repay the costs of unsuccessful litigation. This might even be objectionable since 'the class attorney may face a conflict of interest between his duty to the class as a whole and his felt obligation to the financing class members.' Financially supporting a class action is analogous to the risk taken by attorneys when conducting a lawsuit on a contingent fee basis. If the suit loses, the attorney should be able to bear the loss of not only fees but also costs as a better 'risk-spreader' than the plaintiffs. Such a rationale may underlie the rarity of successful attorney maintenance actions * * *

"Plaintiffs' financial situation should not be relevant only because the class suit is brought under a statute that allows the discretionary awarding of costs and attorney's fees to successful defendants. To allow this discovery creates as much possibility of abuse by defendants as not allowing this discovery provides to plaintiffs. As there is no problem of adequacy of representation to unnamed plaintiffs inherent in the issue, such discovery should not be allowed.

"Through all of the difficulties and complexities of the class action, the court must keep uppermost in mind the

purpose underlying class-action suits. One of the basic reasons for the creations of class actions was to provide a forum for people of all income levels. Allowing defendants to delve into the financial situation of plaintiffs, forcing plaintiffs to prove their financial capability, unreasonably broadens the requirements of Rule 23."

A similar position has also been taken by still another writer in this area. In her lengthy and analytical article in the University of Pittsburgh Law Review, Ms. Judith L. Maute stated, *inter alia* (40 U of Pitt L Rev 70, 92) :

"Recent cases indicate a trend towards investigation of the financial resources and counsel fee arrangements of the representative plaintiffs and perhaps willingness to deny class certification when the court is dissatisfied with these financial factors. This Comment takes the position that financial concerns should be considered an issue in certification proceedings only in the unusual case where independent evidence raises serious doubts as to the representatives' financial or ethical ability to prosecute the case vigorously."

"Few practitioners in the field would dispute that class actions have become procedural nightmares. Pre-certification procedures must be simplified if Rule 23 is to be implemented in accordance with its underlying policies. The trial court has sufficient discretionary authority to examine privately the propriety of financial arrangements with counsel. It should not however, seek bright line assurances that the named plaintiff is financially able to pursue the suit to completion or to reimburse counsel for advanced expenses. This would unduly restrict effective use of the class action device. As a general principle, a defendant who seeks to discover financial data pursuant to Rule 23 (a) (4) should be required to present independent information sufficient to overcome a presumption that an otherwise adequate plaintiff is also financially and ethically adequate. Defendants' pre-certification interest in a judgment secure from collateral attack is not sufficiently immediate to warrant a broader rule of discovery :

"So long as American judges remain committed to granting the essentials of the process that is due, we may hope to

find that the new dimensions of Rule 23 should serve to further rather than impede the objective of all the Rules as it is stated in the first of them—'to secure the just, speedy, and inexpensive determination of every action.' (Frankel, J., *Some Preliminary Observations Concerning Civil Rule 23*, 43 FDR 39 [1968].)"

We concur with the general proposition that the court of original jurisdiction in a class action has the right and indeed the obligation to make a threshold determination as to whether the plaintiff will adequately protect the interests of the class (see, *Tanzer v Turbodyne Corp.*, 68 AD2d 614, 620). Relevant to making such a determination is the ability and willingness of the plaintiff to bear the cost of litigation (*Weitzman v Bache Halsey Stuart, Inc.*, NYLJ, Nov. 4, 1977, p 5, col 1). Thus, questions posed by defendant to a class plaintiff in a pretrial deposition with respect to the latter's willingness and ability to finance the action are permissible, though not to an unlimited degree. We share the concern of other courts and legal writers on the subject that such financial inquiry should not be allowed to degenerate into an oppressive means of discouraging the action, as well as a tactical defense to the class action prior to reaching the substantive issues.

Essentially the financial status of a class plaintiff is but one factor to be considered by the court of original jurisdiction in arriving at a determination as to whether such individual will prosecute the action competently and vigorously and represent the class adequately.

Thus unless a court directs otherwise, based on sufficient independent evidence raised by defendant as to a plaintiff's inability to finance a class action either personally or through other sources, a defendant in a pretrial deposition of plaintiff should be limited to general questions in that regard. Based on plaintiff's answers to defendant's general questioning in this area, Special Term, in its discretion, may require plaintiff to submit *in camera* for its private consideration, affidavits and documents concerning finances, and, as will be discussed below, arrangements, if any, with counsel (cf. *Waldman v Electrospace Corp.*, 68 FRD 281 [SDNY]). As stated by the court in *Waldman (supra,* p 287) : "The appropriate discovery, however, where called

for, is not discovery by defendants of plaintiffs' financial soundness, *but plaintiffs' submission to the court in camera of affidavits on this issue*." (Emphasis supplied.)

Consistent with the above language in *Waldman (supra)*, it should be noted that under subdivision (a) of section 17 of the Uniform Class Actions [Act] [Rule] (12 Uniform Laws Ann, p 31, 1981 Pocket Part), provision is made for submission of fee and advancement agreements upon direction by the court.

Similarly, we are of the opinion that questions at a pretrial deposition pertaining to the class plaintiff's arrangements with counsel regarding fees and expenses should likewise be circumscribed. Initially a defendant in a class action may question plaintiff as to his or her ultimate liability to pay the expenses of the litigation. If the information stemming from such questioning indicates that plaintiff believes he or she is free from ultimate liability, then the assets of plaintiff might conceivably become relevant as evidence that the attorney is maintaining the suit (cf. *Sayre v Abraham Lincoln Fed. Sav. & Loan Assn.*, 65 FRD 379, 385-386, *supra*). Absent some form of guarantee from a plaintiff that he or she is financially ready and able to advance the funds necessary to prosecute the class action properly, or that they are available elsewhere, such as from other party plaintiffs' or counsel for the class, disclosure of plaintiff's finances is appropriate (cf. *Vallone v Delpark Equities*, 95 Misc 2d 161, 167-168).

However, since advancement by counsel with expectation of reimbursement later is a predictable element of many actions, including class actions, where a class plaintiff and the attorney for the class agree that the latter will advance all costs of litigation, or at least costs of notifying the class, and plaintiff will reimburse counsel for all expenses should plaintiff lose, questions concerning plaintiff's financial status become irrelevant on the issue of class certification. Absent some independent evidence that counsel is in fact maintaining the suit with no expectation of reimbursement, no purpose is served by costly and time consuming inquiry into a class plaintiff's status (cf. *Sayre v Abraham Lincoln Fed. Sav. & Loan Assn.*, *supra*, pp 385-386).

It should be mentioned at this time that the court charged with the responsibility of granting or denying certification may require more than counsel's assurance that his firm will advance all necessary funds to prosecute the action. It may require plaintiff to post a bond to cover future expenses of the suit, including, *inter alia*, notification costs as a precondition to any certification under CPLR 901 (cf. *Vallone v Delpark Equities, supra; Sayre v Abraham Lincoln Fed. Sav. & Loan Assn., supra*, p 384). Moreover should plaintiff fail to meet any expenses during the pendency of the suit, the same court could decertify or reduce the class in order to protect members of the class from the *res judicata* effects of a suit in which they were inadequately represented *(Sayre v Abraham Lincoln Fed. Sav. & Loan Assn., supra*, p 384).

Returning to the instant matter we now address ourselves to the four categories of respondents' questions which are the subject of this dispute. With respect to the first category, "Willingness and ability of plaintiff to bear necessary financial expenses to prosecute class action" (questions 17 through 31), we make the following determinations:

Plaintiff is directed to answer questions 17 through 21, which pertain to his awareness of the responsibility of plaintiffs in class actions to bear the expenses of such actions, and to whether anyone else is going to share in the expenses of the action. Should plaintiff during such interrogation (question 17 through 21) give some guarantee that either he, his attorney or others are ready and able to furnish the funds necessary to prosecute the action, at least to the extent of the cost of notice, then the need for further disclosure under this category pertaining to detailed disclosure of plaintiff's assets (questions 22 through 31) will be obviated. However, the court deciding the issue of class certification may still require that plaintiff furnish relevant financial information *in camera*.

As to the second category of questions, "Plaintiff's arrangements with his attorney regarding fees and expenses" (questions 6 through 13), the following determination is appropriate:

In the event that plaintiff, counsel for plaintiff, or others agree to advance the funds needed to prosecute this action,

then it will be unnecessary for plaintiff to answer any questions under this category. However, should there be no such guarantee at this juncture of the questioning, then questions 6, 7 and 9, pertaining to discussions between plaintiff and the attorney about fees to be charged in prosecuting the action, whether plaintiff is paying the attorney anything for his services in the action, and whether plaintiff paid anything to the attorney to prosecute the action, should be answered by plaintiff.

However, it is not necessary for plaintiff to answer questions 8, and 10 through 12 under this category. They encompass inquiries as to any arrangements plaintiff had with the attorney wherein the latter agreed to pay certain incidental pretrial bills such as the costs for transcripts of depositions and a court index number. It is not unusual for counsel for plaintiff to advance moneys for such incidental items in numerous types of actions. Detailed questioning in that regard at a pretrial deposition therefore is not in order.

We are also of the opinion that question 13 need not be answered. Under such question, respondents seek to ascertain whether plaintiff has an understanding with his attorney or anyone else that if this action is successful or compromised, he (plaintiff) will receive anything other than his own individual damages. Since there is nothing in the record before this court that plaintiff has been promised or has agreed to accept an illegal bonus for prosecuting this action, question 13 is irrelevant.

We now turn to the third category of questions, entitled "Decision of plaintiff to bring lawsuit and possible solicitation to bring lawsuit" (questions 1 through 5, 14, and 36). Underlying such questions is an attempt by defense counsel to ascertain whether plaintiff has, at the instance of and with the co-operation of, his attorney, become a (minimal) stockholder in defendant Elgin Corporation, and other corporations, in order to position himself to bring a class action lawsuit. In *Tanzer v Turbodyne Corp.* (68 AD2d 614, *supra*), the Appellate Division, First Department, was confronted with such circumstances. It also found that class representatives were closely related to the lawyers for the class and that they (the class representatives), as a regular

practice, made small investments in corporations for the purpose of bringing lawsuits through the law firm. The investments and interests of the plaintiffs in the lawsuit as stockholders were far smaller than the average of the class they sought to represent and were substantially outweighed by the possibility of benefit to the law firm to which they were closely related. Based on such totality of circumstances the First Department reversed Special Term, and denied class certification.

However, the case at bar, unlike the *Tanzer* case, which had passed the certification stage, is merely at the pretrial discovery level. No evidence has been adduced by defense counsel that the attorney for plaintiff is engaging in a breach of ethics by improper solicitation and maintenance. Absent such evidence and a prima facie demonstration of impropriety, the questions posed under category three are stricken without prejudice to being renewed upon a proper foundation (see *Vallone v Delpark Equities*, 95 Misc 2d 161, 167, *supra;* cf. *Sayre v Abraham Lincoln Fed. Sav. & Loan Assn.*, *supra*, p 386).

Lastly, we direct our attention to the fourth category of questions, "Personal knowledge of plaintiff of allegations in complaint" (questions 15, 16, and 32 through 35). Questions 32, 33 and 34, should be stricken. By means of such questions defense counsel seeks to test plaintiff's familiarity with sections 339-a and 352-c of the General Business Law, which were referred to in the complaint. Questions of this type posed at a pretrial deposition are highly irrelevant since essentially they require an analysis of the law by the witness. However, questions 15, 16 and 35, which concern plaintiff's personal knowledge of allegations in the complaint regarding the size or potential size of the class he seeks to represent, and purported statements in which doubts were expressed about Elgin being entitled to "tax loss carry-forwards" are relevant, and therefore should be answered by plaintiff.

## CONCLUSION

It has been cogently stated that class actions, by their very nature, involve several independent and, at times, conflicting policies *(Vallone v Delpark Equities*, 95 Misc 2d

161, 164, *supra*). The statement is graphically true with respect to disclosure conducted prior to certification as a class action, as is evidenced by the conflicting case law in the area. On the one hand courts must take into account the right of a person to prosecute a class action regardless of his economic station in life, as opposed to the rights of the nameless and faceless individuals comprising the class to be represented adequately. Similarly, delineating the scope and extent of a precertification inquiry for the purpose of obtaining information as to impermissible solicitation and maintenance, without impinging on the confidential relationship of attorney-client, is a problem which has continually perplexed Federal courts over the years and undoubtedly many State courts as well.

In our opinion an in-depth study of the problems involved in precertification disclosure proceedings by a judicial task force or committee may well be appropriate with a view toward the eventual enactment of court rules setting forth guidelines and limitations in this procedural labyrinth. Serious consideration should be given to having class actions assigned to, and closely monitored by, the same Judge from the initial pleadings to the final judgment. As Mr. Justice KASSAL noted in *Vallone v Delpark Equities (supra,* p 169): "Within this process, it would be more appropriate for disclosure to proceed in discreet steps under supervision." If a class action is to be managed with sensitivity both to the plaintiff's reasonable demands and to defendant's responsibilities, "the * * * judge must keep close to the heart of the litigation" *(Yaffe v Powers,* 454 F2d 1362, 1367).

Accordingly the order of Special Term should be modified as follows: (1) by directing plaintiff to answer questions 6, 7, 9, and 17 through 31, unless he guarantees that either he or his attorney or others will furnish funds necessary to prosecute the action (at least the cost of notice to the class); (2) by striking questions 8, 10 through 13, and 32 through 34 unconditionally; and (3) by striking questions 1 through 5, 14 and 36, without prejudice to their being renewed by respondents upon a proper foundation. As so modified, the order should be affirmed, without costs or disbursements.

MANGANO, O'CONNOR and WEINSTEIN, JJ., concur.

Appeal from an order of the Supreme Court, Kings County, dated February 5, 1979, which, *inter alia*, granted the cross motion of defendants Carter, Graham and Utilities & Industries Corp. to compel plaintiff to answer certain questions propounded at an examination before trial.

Leave to appeal is hereby granted by Mr. Justice TITONE.

Order modified by providing that plaintiff's motion for a protective order is granted, and the cross motion is denied, to the following extent: (1) questions 6, 7, 9 and 17 through 31 are to be answered, unless plaintiff guarantees that either he or his attorney or others will furnish funds necessary to prosecute the action (at least to the extent of the cost of notice to the class); (2) questions 8, 10 through 13, and 32 through 34, are stricken unconditionally; and (3) questions 1 through 5, 14 and 36 are stricken, without prejudice to renewal upon a proper foundation. As so modified, order affirmed, without costs or disbursements.

# APPENDIX

## CATEGORIES OF QUESTIONS

I. *Willingness and ability of plaintiff to bear necessary financial expenses to prosecute class action.*

17. "Mr. Stern, are you aware that the plaintiffs in class actions are customarily called upon to bear certain expenses in the prosecution of the action?"

18. "Mr. Stern, if the Court determines that you are responsible for bearing the expenses, are you prepared to meet those expenses?"

19. "Mr. Stern, when you commenced this action did you have any expectations that you might be requested to pay the cost and expenses of this action?"

20. "Mr. Stern, has anyone suggested to you that you would not have to bear any expenses in this action?"

21. "Is anyone going to share any of the expenses of this action, to your knowledge?"

22. "Is there any monetary limit on the amount of money you would be prepared to advance in conjunction with this action?"

23. "Mr. Stern, what is your present income?"

24. "What is your present net worth?"

25. "What assets do you have?"

26. "Other than stock in Elgin National Industries that you have disposed of some time ago, have you owned any other stock over the 24 years that you have been investing?"

27. "Would you say approximately what the present market value of [your] stock is?"

28. "Approximately how much money have you received in [stock] dividends over the past year?"

29. "Do you maintain a savings account?"

30. "Do you maintain a checking account?"

31. "With respect to the bank accounts that you have, how much money is in the various accounts?"

II. *Plaintiff's arrangements with his attorney regarding fees and expenses.*

6. "Has there ever been any discussion between you [and Mr. Bader] about fees that would be charged in prosecuting this action?"

7. "Are you paying Mr. Bader anything for his services in this action?"

8. "Have you received any bills from Mr. Bader to date for any services that he has rendered or [for] any disbursements with respect to this action?"

9. "Have you paid anything to Mr. Bader or anyone else with respect to the prosecution of this action?"

10. "I think at the beginning of the deposition you were here and heard Mr. Bader indicate that he was going to order a transcript of this deposition. I assume you are also aware that that costs money.

"Do you have any arrangement with Mr. Bader regarding the cost of that deposition transcript?"

11. "Do you expect to receive a bill from Mr. Bader for the cost of the deposition transcript?"

12. "When the action was commenced it was necessary to

purchase a Court Index number. Did you receive a bill for that cost?"

13. "Do you have any understanding with Mr. Bader or anyone else that if this action is successful or if it is compromised, you will receive anything other than your own individual damages?"

III. *Decision of plaintiff to bring lawsuit and possible solicitation to bring lawsuit.*

1. "Did you consult with anyone other than Mr. Bader about bringing the present lawsuit?"

2. "Do you recall how you came to Mr. Bader with respect to this lawsuit?"

3. "Had anyone recommended Mr. Bader to you?"

4. "Do you know whether your registered representative, Mr. Hyman, has had any dealings with Mr. Bader on any cases?"

5. "Do you know whether Mr. Hyman has ever referred any business to Mr. Bader?"

14. "Did you have any discussions with anyone whether this action should be brought individually, just on behalf of yourself, or as a class action?"

36. "Did you have discussions with [Mr. Hyman] about this case?

"A. Several discussions, yes.

"What was the subject of those discussions?"

IV. *Personal knowledge of plaintiff of allegations in complaint.*

15. "Are you aware of the size or the potential size of the class that you represent?"

16. "Mr. Stern, the document that I have marked as Exhibit 8 is the complaint in this action. Paragraph 11, subsection 1 states, 'The number of members of this class is not known with particularity but if 300,000 shares were tendered, the number of members would probably be about 3,000.' Do you have knowledge or information concerning that statement?"

32. "Are you familiar with Section 339A of the General Business law referred to in paragraph 6 of the complaint?"

33. "Have you ever read Section 339A of the General Business law?"

34. "Paragraph 13th of the complaint, as part of the [Second] Cause of Action, refers to Section 352C of the General Business law. Do you know anything about that [Section]?"

35. "Do you know anything about, do you have any personal knowledge about any statements in either annual reports or tender offer material or public filings [in] which there was doubt expressed about whether Elgin would be entitled to tax loss carry-forwards?"